## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No._____ -Civ

GEORGE WORTHINGTON
and ADRIA WORTHINGTON,

          Plaintiffs,

     v.

NATIONAL GYPSUM COMPANY, a Delaware
Corporation,

         Defendant.

_____/

## COMPLAINT

Pursuant to Fed. R. Civ. P. 23, Plaintiffs, GEORGE WORTHINGTON and ADRIA WORTHINGTON, own a home containing National Gypsum drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and  health hazards.  The drywall has been manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendant, National Gypsum Company ("National Gypsum").  In support thereof, Plaintiffs bring an action against said Defendant and state as follows:

## INTRODUCTION

1.    There is a significant problem in the United States with defective American-manufactured drywall.  This defective drywall contains high levels of sulfur, and/or other organic compounds. Defendant's American-manufactured drywall, which is a domestically manufactured product, not a Chinese-manufactured product, used in the Plaintiffs' home, is inherently defective because it emits various sulfide gases and/or

other chemicals through "off-gassing" that create noxious, "rotten egg-like" odors, and causes corrosion ("the Defect") of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property"), and causes irritant effects and health hazards.

2.     This Defect is latent and existed in Defendant's American-manufactured drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted.  There is no repair, short of removal, that will correct the Defect.

3.     As a result of Defendant's conduct as alleged herein, Plaintiffs have suffered economic losses by owning a home containing inherently defective American-manufactured drywall that has caused damage to their home and Other Property.

4.     Plaintiffs have incurred or will incur damages in excess of $75,000 including, but not limited to: repair/replacement of their home; damage to Other Property, and/or any materials contaminated or corroded by the drywall as a result of "off-gassing"; and/or incidental and consequential damages.

5.     Further, as a result of Defendant's conduct as alleged herein, Plaintiffs have suffered harm and/or been exposed to an increased risk of harm and thus have a need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring and medical monitoring.

6.     Plaintiffs bring this action as owners of a residential home in Florida that contains defective, hazardous, or dangerous American-manufactured drywall

manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendant.

## JURISDICTION, PARTIES, AND VENUE

7.     The amount in controversy of this action exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

8.     Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1-2) because a substantial amount of the events and occurrences giving rise to the claim occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district.

## PARTIES

9.     Plaintiffs, George Worthington and Adria Worthington, are residents of Broward County, Florida, and own a home located at 169 SE 2nd Court, Deerfield Beach, Florida 33441.   Plaintiffs' home was built and constructed using defective drywall manufactured and supplied by Defendant. The Plaintiffs moved into their home on or about August 15, 2006, and solely due to the effects of Defendant's defective American-manufactured drywall, Plaintiffs moved out of the home.

10.     Defendant National Gypsum is organized and incorporated under the laws of the state of Delaware, with its principal place of business located at 2001 Rexford Road, Charlotte, North Carolina 28211.   National Gypsum is one of the largest manufacturers of gypsum board in the world, specifically including its operations of its manufacturing plant located at 12949 US Highway 41 S, Gibsonton, Florida ("Apollo Beach Plant").

11.    Defendant National Gypsum directly, or indirectly through agents, affiliates or co-conspirators, manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold defective American-manufactured drywall in the United States, including Florida.  Defendant National Gypsum's acts or omissions related to defective American-manufactured drywall, directly, or indirectly through agents, affiliates or co-conspirators, injured Plaintiffs as alleged herein.

## **GENERAL ALLEGATIONS**

**A.     Drywall Background**

12.    Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

13.    A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

14.    Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

15.    The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

16.    The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

17.    Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

18.    Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

19.     Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

20.     The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

21.     In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants.

22.     Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

23.     As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

24.     Twenty to thirty percent of all American-manufactured drywall is made with synthetic gypsum.

25.     National Gypsum produces synthetic gypsum at its Apollo Beach Plant near Tampa, Florida.

26.     National Gypsum's synthetic gypsum is produced utilizing waste from the pollution scrubbers of Tampa Electric Company's coal fired power plants.

**B**.     **How Drywall Is Created**

27.     In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

5

28.     When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

29.     The gypsum powder is then mixed with water to form a paste or slurry.

30.     While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

31.     Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

32.     The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

33.     Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

34.     On information and belief, Defendant National Gypsum completes its production process by labeling and printing on the back of finished board information, specifically including the production date.  This identifying information should allow the identification of the date of manufacture, location of manufacture and the volume of material produced.

C.     **RECYCLED GYPSUM**

35.     In recent years, there has been an increase in the use of recycled scrap drywall in the manufacture of new American-manufactured drywall.

36.   The construction of an average 2000 square foot home will generate one ton of unused scrap drywall.

37.   Gypsum recyclers collect scrap drywall from mobile recycling units and other sources for sale to gypsum board manufacturers, including Defendant National Gypsum.  The recycled gypsum powder generated from recycled construction waste is less expensive than the price of some other gypsum raw materials.

38.   Defendant National Gypsum, as well as other American drywall manufacturers, participates in gypsum recycling systems and purchases wallboard scrap from gypsum recyclers.

39.   Defendant National Gypsum and other American drywall manufacturers process and add recycled waste drywall to the mix of raw materials in the production process of American drywall.

**D.     The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur Gases**

40.   Upon information and belief, Defendant's drywall contained naturally mined gypsum, synthetic gypsum manufactured from CCBs and recycled gypsum.

41.   When gypsum, mined, synthetic or recycled, is subjected to certain environmental conditions present in the United States, or Florida in particular, which has both hot weather and high humidity, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

42.   The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

43.   The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

44.   Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed.

45.   Defendant National Gypsum manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold defective American-manufactured drywall in the United States and in Florida, which was unreasonably dangerous for its normal use in that the drywall caused, and continues to cause, corrosion to HVAC coils, electrical wiring, plumbing components, appliances and other building materials and items in the home.

46.   The sulfide released from the defective drywall further makes the product unreasonably dangerous for its normal intended use because it causes people to suffer corrosion and irritant effects.

47.   Defendant National Gypsum's defective American-manufactured drywall detrimentally affects and ultimately requires the replacement of a variety of household items, including but not limited to, air conditioning units, wiring, plumbing components, appliances and other building materials and items in the home.  In addition, the defective drywall has a noxious odor.

48.   Plaintiffs George Worthington and Adria Worthington, purchased their home located at 169 SE 2nd Court, Deerfield Beach, Florida 33441.

49.   During the Worthingtons' residence within the home, they suffered damages to appliances and personal property.

50.   No plaintiff could have discovered the existence of the defect in the American-manufactured drywall prior to the time that the Consumer Product Safety Commission (CPSC) announced it was investigating problematic American manufactured drywall in 2009.

51.   On information and belief, Defendant National Gypsum knew of the defective nature of their American-manufactured drywall as described herein and the probable impacts; however, Defendant National Gypsum actively concealed the same from the consuming public, and the Plaintiffs.

**Conditions Precedent**

52.   All notice required by Chapter 558, Florida Statutes, and all other conditions precedent to bringing this action have been met, will have been met or were waived by Defendant.

**COUNT I**
**NEGLIGENCE**

53.   Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein.

54.   Defendant owed a duty to Plaintiffs to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) distributing, e) delivering, f) supplying, g) inspecting, h) marketing, and/or i) selling drywall, including a duty to adequately warn of its failure to do the same.   Defendant's duty includes, but was not limited to the following:

a.      using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

b.      using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

c.      using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.      using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

e.      using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

f.      using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

g.      using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

h.      using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

i.      using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

j.      adequately warning and instructing the Plaintiffs of the Defects associated with drywall;

k.      properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

l.      properly selecting the gypsum that did not contain excessive levels of sulfur;

10

m.    recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

n.    advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

o.    not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

p.    not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

q.    not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

r.    not concealing information from Plaintiffs regarding reports of adverse effects associated with drywall; and

s.    not improperly concealing and/or misrepresenting information from the Plaintiffs and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and otherwise exercising reasonable care in the design, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

55.   Defendant was negligent and breached its duty to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) distributing, e) delivering, f) supplying, g) inspecting, h) marketing, and/or i) selling of drywall, including a duty to adequately warn of its failure to do the same.   Defendant's negligence included, but was not limited to the following:

t.   failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

u.   failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein:

v.   failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

w.   failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

x.   failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

y.   failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

z.      failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

aa.     failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

bb.     failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

cc.     failing to adequately warn and instruct the Plaintiffs of the Defects associated with drywall;

dd.     failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

ee.     failing to properly select the gypsum that did not contain excessive levels of sulfur;

ff.     failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

gg.     advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

hh.     misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

ii.    manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

jj.    distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

kk.    concealing information from Plaintiffs regarding reports of adverse effects associated with drywall; and

ll.    improperly concealing and/or misrepresenting information from the Plaintiffs and/or the public, concerning the severity of risks and dangers of Defendant's drywall and/or the manufacturing Defect; and failing to otherwise exercising reasonable care in the design, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

56.   As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their home; the removal and replacement of all of the drywall contained in their home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

57.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while the home is being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the home; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

58.     Defendant knew or should have known that its wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

**COUNT II**
**STRICT LIABILITY**

59.     Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein.

60.     At all times relevant hereto, Defendant was in the business of designing, manufacturing, exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

61.     The drywall, including that installed in the home of Plaintiffs, was placed by Defendant in the stream of commerce.

62.     Defendant knew that the subject drywall would be used without inspection for defects by consumers.

63.     Defendant intended that the drywall reach the ultimate consumer, such as Plaintiffs, and it indeed reached Plaintiffs when it was installed in their home.

64.     When installed in the Plaintiffs' home, the drywall was in substantially the same condition it was when Defendant manufactured, sold, and/or delivered it.

65.    At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendant, and in accordance with the Defendant's directions and instructions.

66.    The subject drywall was not misused or altered by any third parties.

67.    The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

68.    The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

69.    The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

70.    The drywall was also defective because it was improperly exported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

71.   The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs.

72.   The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct the Plaintiffs of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

73.   Plaintiffs were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs, acting as reasonably prudent people discover that Defendant's drywall was defective, as set forth herein, or perceive its danger.

74.   Defendant's defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

75.   Defendant's defective drywall benefit to Plaintiffs, if any, was greatly outweighed by the risk of harm and danger to them.

76.   The defects in the drywall, as well as Defendant's failure to adequately warn the Plaintiffs of the defects, rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs.

77.   As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their home; the removal and replacement of all of the drywall contained in their home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal

surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

78.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while the home is being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the home; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## COUNT III
## NATIONAL GYPSUM'S VIOLATION OF THE
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS

79.    Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein. This is an action for relief under the various unfair and deceptive trade practices acts.

80.    The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") makes it unlawful to engage in unfair or deceptive acts or practices in or affecting commerce.

81.    NCUDTPA provides that any person injured by "any act or thing done by any … corporation in violation of [NCUDTPA] … shall have a right of action" thereunder.  Plaintiffs are "persons" within the meaning of NCUDTPA.

82.    NCUDTPA defines "Commerce" as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

83.    Defendant National Gypsum's advertising, soliciting, providing, offering, or distributing of drywall is "commerce" within the meaning of NCUDTPA.

84.     Defendant National Gypsum's acts and omissions, as well as their failure to use reasonable care in this matter as alleged in this Complaint, is either a deceptive or unfair act or practice.

85.     Defendant National Gypsum's unconscionable, illegal, unfair and deceptive acts and practices violate NCUDTPA.

86.     Plaintiffs have suffered actual damage for which they are entitled to relief pursuant to NCUDTPA.

87.     Plaintiffs are entitled to recover their reasonable attorneys' fees pursuant to these statutes upon prevailing in this matter.

88.     As a direct and proximate cause of Defendant National Gypsum's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their home; the removal and replacement of all of the drywall contained in their home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

89.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while their home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

90.     Pursuant to NCUTPA, Plaintiffs are entitled to treble damages.

**COUNT IV**
**UNJUST ENRICHMENT**

91.     Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein.

92.     Defendant received monies as a result of Plaintiffs' purchase of Defendant's defective drywall, or purchase of their home containing this drywall, either directly or through an agent, and Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs.

93.     Defendant's acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendant to retain the benefit without payment of the value to the Plaintiffs.

94.     Defendant, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

95.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their home; the removal and replacement of all of the drywall contained in their home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

96.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while their home is being repaired; renting of comparable housing during the

duration of the repairs; the loss of use and enjoyment of real property; and the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

97.     Defendant knew or should have known that its wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

<u>**COUNT V**</u>
**EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING**

98.     Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein.

99.     Plaintiffs are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

100.     Plaintiffs will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if Defendant is not ordered to recall, buy back, and/or repair the Plaintiffs' home.

101.     Plaintiffs demand injunctive and equitable relief and further, that Defendant be ordered to: (1) remedy, repair and/or replace the drywall in the home, (2) cease and desist from misrepresenting to the general public that there is no defect in, or danger associated with, the drywall, (3) institute, at their own cost, a public awareness campaign to alert the general public of the defect, dangers associated with the drywall (4) create, fund, and support a medical monitoring program consistent with the requirements of Florida law.

102.     Until Defendant's defective drywall has been removed, Defendant should provide continued environmental and air monitoring in Plaintiffs' home.

103.     Plaintiffs have been exposed to greater than normal background levels of sulfides and other hazardous chemicals as a result of exposures to Defendant's defective drywall.

104.     The sulfides gases and the other chemicals which have been released from Defendant's drywall and to which Plaintiffs have been exposed are proven hazardous, dangerous, or toxic substances.

105.     Plaintiffs' exposure was caused by the Defendant's negligence or otherwise tortious conduct.

106.     Plaintiffs' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

107.     The method and means for diagnosing the Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the Plaintiffs by preventing or minimizing health problems that they may encounter as a result of the defective drywall.

108.     As a proximate result of their exposure to sulfide gases and other toxic chemicals from Defendant's defective drywall, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

109.     Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

110.     The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## COUNT VI
## NUISANCE

111.    Plaintiffs adopt and restate paragraphs 1-52 as if fully set forth herein.

112.    At all times relevant hereto, Defendant was in the business of exporting, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

113.    The drywall, including that installed in the home of Plaintiffs, was placed by Defendant in the stream of commerce.

114.    Defendant knew that the subject drywall would be used without inspection for defects by consumers.

115.    Defendant intended that the drywall reach the ultimate consumer, such as Plaintiffs, and it indeed reached Plaintiffs when it was installed in their home.

116.    When installed in the Plaintiffs' home, the drywall was in substantially the same condition it was when Defendant distributed, supplied, sold, and/or delivered it.

117.    At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendant, and in accordance with the Defendant's directions and instructions.

118.    The subject drywall was not misused or altered by any third parties or Plaintiffs.

119.    The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, delivered, and/or sold.

120.    The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets,

utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

121.   The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

122.   The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs.

123.   Defendant's defective drywall was unreasonably dangerous and harmful as described herein.

124.   Defendant's defective drywall benefit to Plaintiffs, if any, was greatly outweighed by the risk of harm and danger to them.

125.   Defendants' drywall is a nuisance, as the sulphur and other gasses emitted unreasonably interfere with Plaintiffs' use and enjoyment of their property by corroding Other Property.

126.   Corrosion itself is an unreasonable interference with Plaintiffs' use and enjoyment of their property.

127.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their home; the removal and replacement of all of the drywall contained in their home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

128.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while their home is being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the home; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand:

a.   compensatory damages;

b.   an order and judgment requiring the necessary repairs, relocation costs, personal property replacement, establishment of environmental and medical monitoring programs;

c.   pre-judgment and post-judgment interest, as applicable, at the maximum rate allowable at law;

d.   all statutory damages;

e.   an award of attorneys' fees as allowed by contract or statute;

f.   an award of taxable costs;

g.   equitable, injunctive, and declaratory relief;

h.   environmental and air monitoring;

i.   medical monitoring; and

j.   such other and further relief under all applicable state and federa1 law and any other relief the Court deems just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

DATED:    May 12, 2010

S/ GREGORY S. WEISS
THEODORE J. LEOPOLD
Fla. Bar No.  705608
tleopold@leopoldkuvin.com
GREGORY S. WEISS
Fla. Bar No. 163430
gweiss@leopoldkuvin.com
LEOPOLD~ KUVIN
2925 PGA Blvd., Suite 200
Palm Beach Gardens, Florida 33410
Phone: (561) 515-1400
Fax:    (561) 515-1401
*Counsel for Plaintiffs*